IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 22-cr-00101-CMA

UNITED STATES OF AMERICA,

Plaintiff,

v.

ALEXIS NICOLE WILKINS,

Defendant.

## PLEA AGREEMENT

The United States of America (the government), by and through Peter McNeilly,

Assistant United States Attorney for the District of Colorado, and the defendant, Alexis

Nicole Wilkins, personally and by counsel, Mary Butterton, Assistant Federal Public

Defender, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1. This

agreement binds only the Criminal Division of the United States Attorney's Office for the

District of Colorado and the defendant.

## I.  AGREEMENT

### A. Defendant's Plea of Guilty:

The defendant agrees to

(1)   Plead guilty to Count 1 of the Indictment, charging a violation of 21 U.S.C.
      § 841(a)(1) and (b)(1)(C), Distribution of a Mixture or Substance
      Containing a Detectable Amount of Fentanyl, a Schedule II Controlled
      Substance, Resulting in Death;

(2)   Waive certain appellate and collateral attack rights, as explained in detail
      below; and

**COURT EXHIBIT
1**

(3)     Agree not to contest forfeiture as more fully described below.

**B. Government's Obligations:**

This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A) and (B). The government agrees to recommend a sentence no higher than 240 months imprisonment (the statutory mandatory minimum). The government further agrees to move to dismiss Counts 2 and 3 of the Indictment with prejudice. Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, move to reinstate any or all of the counts dismissed pursuant to this agreement and potentially file a superseding indictment. The parties understand that this agreement is not binding on the Court.

Provided the defendant does not engage in prohibited conduct or otherwise implicate USSG §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a one level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(b).

The government agrees to not oppose the defendant's request to be housed in a Federal Bureau of Prisons Federal Medical Center (FMC) during her period of incarceration, if the defendant chooses to make such a request to the sentencing court.

**C. Defendant's Waiver of Appeal:**

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding

this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

(1)     the sentence exceeds the maximum sentence provided in the statute of conviction, 21 U.S.C. § 841(a)(1) and (b)(1)(C);

(2)     the sentence exceeds the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court) at a total offense level of 35; or

(3)     the government appeals the sentence imposed.

If the first criteria applies, the defendant may appeal only the issue of how her sentence exceeds the statutory maximum sentence. But if one of the latter two criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

(1)     the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

(2)     the defendant was deprived of the effective assistance of counsel; or

(3)     the defendant was prejudiced by prosecutorial misconduct.

The Defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by

the court during the district court revocation proceedings. In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The Defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

### D. Forfeiture of assets:

The defendant admits the forfeiture allegations. The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 21 U.S.C. § 853, whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere. These assets include, but are not limited to, $7,679 in U.S. currency seized from the defendant's residence. The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action. The defendant understands that, pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters. Having been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily

waives her rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to her if notice is not sent within the prescribed time frames. The defendant further agrees to the forfeiture of any substitute assets up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e).

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

## II.   ELEMENTS OF THE OFFENSE

The parties agree the elements of 21 U.S.C. § 841(a)(1) and (b)(1)(C), Distribution of a Mixture or Substance Containing a Detectable Amount of Fentanyl, a Schedule II Controlled Substance, Resulting in Death are as follows[1]:

*First*: The defendant knowingly or intentionally distributed a controlled substance as charged;

*Second*: The substance was in fact a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance; and

*Third*: Death resulted from use of the mixture or substance containing a detectable amount of fentanyl.

---

[1] Tenth Circuit Pattern Jury Instruction 2.85.1 (2021).

### III.    STATUTORY SENTENCE

The statutory sentence for a violation of Count 1 of the Indictment is: not less

than 20 years and not more than life imprisonment; not more than a $1,000,000 fine; not

less than three years and not more than a lifetime of supervised release; and a $100

mandatory victim's fund assessment fee.

### IV.    COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the

rights to possess firearms, vote, hold elected office, and sit on a jury.

### V.    STIPULATION OF FACTS

The factual basis for this plea is set forth below. Because the Court must, as part

of its sentencing methodology, compute the advisory guideline range for the offense of

conviction, consider relevant conduct, and consider the other factors set forth in 18

U.S.C. § 3553, additional facts may be included below which are pertinent to those

considerations and computations. To the extent the parties disagree about the facts set

forth below, the stipulation of facts identifies which facts are known to be in dispute at

the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-

contradictory additional facts which are relevant to the Court's guideline computation, to

other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree the government would be able to prove the following facts at

trial.

*Death of Juvenile #1 on December 3, 2021*

On December 3, 2021, Juvenile #1 (YOB: 2006) appeared to have overdosed during class at Mitchell High School in Colorado Springs, Colorado. At the end of class, a teacher activated emergency medical services after Juvenile #1 was observed foaming at the mouth and unresponsive. Emergency Medical Services (EMS) and members of the Colorado Springs Police Department (CSPD) arrived and initiated life saving measures. Juvenile #1 was transported to a local hospital, where she was declared deceased. The El Paso County Coroner/Medical Examiner's Office performed an autopsy on Juvenile #1. The cause of death listed in the report was "fentanyl intoxication."

Members of the CSPD interviewed several juveniles at Mitchell High School on December 3, 2021. Juvenile Witness A (YOB: 2007) stated Juvenile #1 uses "percs" and obtained "percs" from Juvenile #3. Juvenile Witness A was not sure where Juvenile #3 purchased the pills. Juvenile Witness B (YOB: 2007) stated Juvenile #1 and Juvenile #3 take "Percocet." Juvenile Witness B believed the supplier of the "Percocet" was an older, black female. Juvenile Witness B believed the supplier's name was "Lex," which is consistent with one or more nicknames for the defendant.

*Statements of Juvenile #2*

Juvenile #2 (YOB: 2006) provided statements on December 3, 2021. She stated Juvenile #3 and Juvenile #1 used "Percocet" in the bathroom that morning at school. Juvenile #3 said the "Percocet" hurt Juvenile #3's stomach, and Juvenile #3 called her mom and subsequently went to the hospital. Juvenile #2 also showed a screenshot of a

Facebook account bearing the vanity name "Lexii Nicole" to law enforcement and stated that was the woman who sold her pills.

Juvenile #2 was subsequently interviewed by a child forensic interviewer. During the interview, Juvenile #2 stated she had been purchasing alcohol, nicotine, and "percs" from an individual she knew as "Lexi."[2] Juvenile #2 said she was introduced to Lexi via a Denver gang member in approximately February of 2021, and she communicated with Lexi primarily via Facebook messenger.[3] Juvenile #2 positively identified a Facebook account with the vanity name "Lexii Nicole" as belonging to Lexi and as the account she used to message Lexi.

Prior to being shown a photograph from the profile of the Facebook account, Juvenile #2 described Lexi as a black female, approximately 23 years of age, with long hair and distinct tattoos on her chest. Juvenile #2's description was consistent with photos openly posted to the Facebook account for "Lexii Nicole," and Juvenile #2 said the woman in the photo associated with the Facebook account was the same person that sold her "Percocet." The defendant was the woman in the photo Juvenile #2 identified as "Lexi."

Juvenile #2 indicated the defendant was aware of her juvenile status;[4] however, the defendant continued to sell Juvenile #2 drugs. Juvenile #2 explained the defendant had been selling "Percocet" to Juvenile #2 for several months, and Juvenile #2 would sometimes act as an intermediary to get drugs or other illegal items from the defendant

---

[2] The defendant denies ever acquiring alcohol or cigarettes for Juvenile #2.
[3] The defendant contends she met Juvenile #2 through Facebook, not through a third party.
[4] The defendant denies ever having a conversation about Juvenile #2's age.

for Juvenile #2's friends. Juvenile #2 estimated that, in 2021, she had purchased 30 or 40 Percocet pills for a total of several hundred dollars from the defendant.[5]

Juvenile #2 said, on December 2, 2021, the day before Juvenile #1's death, she contacted the defendant via Facebook messenger (on the account bearing the name "Lexii Nicole") on behalf of Juvenile #3 to arrange the purchase of two "Percocet" for a total of $40 at the Citadel Mall in Colorado Springs, Colorado. Juvenile #2 and Juvenile #3 then met the defendant at the Citadel Mall and exchanged $40 for two blue pills.[6] Juvenile #2 noted the pills they purchased that day looked different and were a lighter blue color than normal.

Juvenile #2 explained that, on December 3, 2021, Juveniles #1, #2, and #3 met in a girls' bathroom at Mitchell High School. Juvenile #2 said the girls ground the pills they got from the defendant, and Juveniles #1 and #2 snorted the pills. Investigators have obtained video surveillance footage from Mitchell High School which shows the three juveniles entering a girls' bathroom on the morning of December 3, 2021. Juvenile #2 said, after Juvenile #1 died, Juvenile #2 sent a message to the defendant on Facebook informing the defendant that the pills she sold to Juvenile #2 caused her friend to die.[7] Juvenile #2 said the defendant did not respond to the message.

---

[5] The Facebook messages between the defendant and Juvenile #2 which law enforcement officers were able to obtain provide evidence that Juvenile #2 bought less than 20 pills from the defendant between August and December 2021.

[6] This statement appears to be inconsistent with the Facebook messages between the defendant and Juvenile #2 which law enforcement officers were able to obtain. Those records seem to indicate Juvenile #2 planned to purchase one pill for $16 on the evening of December 1, 2021.

[7] Juvenile #2 later "unsent" several messages to the defendant, so the content of the messages remains unverified. The defendant denies ever receiving a message about a death. The Facebook messages between the defendant and Juvenile #2 which law enforcement officers were able to obtain indicate the defendant continued to receive messages from Juvenile #2 asking for pills until January 2022.

*Statements of Juvenile #3*

Juvenile #3 stated she went to the mall with Juvenile #2 on December 2, 2021, to buy a pill ("Percocet") from the defendant. Juvenile #3's statement was corroborated by a bus pass she provided, which showed the ticket to the mall was issued at 5:28 p.m. on December 2. Juvenile #3 said the defendant was in a silver Jeep Cherokee. Juveniles #2 and #3 went to the defendant's car together. Juvenile #3 had the money because she was the one with pockets. Juvenile #3 explained they had contacted the defendant through Facebook to arrange the purchase. Juvenile #3 also identified a picture of the defendant from Facebook.

After purchasing a pill from the defendant, Juveniles #2 and #3 went back into the mall, smashed the pill in the bathroom, and snorted some of it. They retained the rest in a folded dollar bill. Juvenile #2 stayed the night at Juvenile #3's house, where the two used a little more of the crushed pill. The next morning, Juvenile #3's mom took Juveniles #2 and #3 to school. They grabbed breakfast and then met up with Juvenile #1 and went to a bathroom. In the bathroom, Juvenile #1 and Juvenile #2 used more of the pill in a stall. Juvenile #3 explained she was throwing up in a different stall, but she could hear snorting sounds in the stall where Juveniles #1 and #2 were. The girls eventually separated and went to their respective classes.

Juvenile #3 later went to the nurse's office and then called her mom to pick her up from school because her stomach was upset. She explained her stomach had been upset since snorting the crushed pill the evening before. She later found out from a friend that Juvenile #1 had died.

Juvenile #3's mother confirmed that Juveniles #2 and #3 did go to the Citadel Mall on the evening of December 2, 2021.

### Review of Information from the Defendant's Facebook Account

On January 19, 2022, agents obtained a federal search warrant for the Facebook account of "anallen10234" with a vanity name of "Lexii Nicole." In response to the search warrant, Facebook returned a voluminous amount of data which included over 80,000 pages of documents. Content from the Facebook account confirms Alexis Nicole Wilkins is the user of the Facebook account of "anallen10234" with a vanity name of "Lexii Nicole." In the "About / Contact and Basic Info" section of the page, the user of the account listed her date of birth as March 22 but did not include a year. The defendant was born on March 22. The registered email address associated with the "Lexii Nicole" Facebook account is alexiswilkins98@yahoo.com and the account was created on March 14, 2010.

The user of the account has posted several profile photos of herself to the account. A comparison of those photos to other known photographs of the defendant established the defendant is the user of the Facebook account. The Facebook profile photograph is the photograph that both Juveniles #2 and #3 identified as the woman who sold them pills at the Citadel Mall on December 2, 2021. It is also worth noting, in the Facebook profile photo, the woman has a tattoo just below her neck which says "Wilkins."

Some of the information Facebook provided in response to the warrant was location data associated with the account. Investigators reviewed this information and

found the user's location data is consistent with someone who lives at in the Citadel Village Apartment Homes, which are very close to the Citadel Mall. Regularly, in December of 2021 and January of 2022, Facebook reported the user of the account at the Citadel Village Apartment Homes.

For example, and notable because of the events of December 2, 2021, Facebook provided information which showed the user of the account was at the Citadel Village Apartment Homes on December 2, 2021, at approximately 6:12 p.m., which is very close to the Citadel Mall, where the deal with Juveniles #2 and #3 occurred.

Using the "Lexii Nicole" Facebook account, the defendant is a member of several different "groups" on Facebook. Some of the defendant's private group memberships are centered around drug distribution. There are also hundreds of photographs and posts by other members of those private groups that display photographs of illegal drugs and advertise the sale of illegal drugs, including but not limited to "blues" or "M30" pills, methamphetamine, marijuana, cocaine, and Xanax.

The defendant also had a significant number of private messages with individuals discussing the distribution of illegal drugs. For example, the following conversation occurred on or about July 6, 2021, with a Facebook user whose vanity name can be reduced to the initials R.S.:

| Date | From | To | Message |
|------|------|-----|---------|
| 07/06/2021 | Wilkins | R.S. | My fault I had my kids today how much you can lower it if I buy 4 k worth<br><br>I got a bomb plug for 5.50 but I want stronger ones |
| 07/06/2021 | R.S. | Wilkins | if you trying to spend that I can put you in the building might even bring it to you |

|  |  |  | My sis got the golden trail all of them you bring that okay now I said s*** I'll put you with a fire deal you dig |
| 07/06/2021 | Wilkins | R.S. | I get 700 for 3,850 every reeup n na I'ma need that one then you come to me tom I have it ready how many we talking<br>I got 300 left to go I reeup every week if it's great |

On November 29, 2021, the defendant had the following conversation with a

Facebook user whose vanity name can be reduced to the initials J.C.:

| Date | From | To | Message |
| --- | --- | --- | --- |
| 11/29/2021 | J.C. | Wilkins | Who needs real blues? |
| 11/29/2021 | Wilkins | J.C. | Oh I wouldn't know I sell 30s so asking me is like giving away my people lol |
| 11/29/2021 | J.C. | Wilkins | I feel it I'm just low on bread I didn't know if you still sold them or not my bad ain't trying to step on toes |
| 11/29/2021 | Wilkins | J.C. | Oh your fine I don't have the real ones tho but better luck in the group chats yanno |
| 11/29/2021 | J.C. | Wilkins | Do you have 30s? How much for 20 |
| 11/29/2021 | Wilkins | J.C. | 13 a p |

During this message, it appears Copeland was attempting to buy or sell actual

30mg oxycodone pills, or "real blues." The defendant replied that she sells "30s," and

told Copeland ". . . I don't have the real ones . . . ." This indicates the defendant knew

the pills she was selling were not made by a pharmaceutical company. The date of the

conversation is important because the defendant sold a pill to Juveniles #2 and #3 on

December 2, 2021, which caused Juvenile #1's death on December 3.

Investigators also found the following conversation which appears to be the one

which arranged Wilkins's sale of a fentanyl pill to Juveniles #2 and #3 at the Citadel Mall

on December 2, 2021. The Facebook account with whom the defendant was

communicating was confirmed to belong to Juvenile #2.

Page 13 of 18

| Date | From | To | Message |
|------|------|------|---------|
| 12/2/2021 | Juvenile #2 | Wilkins | I got 16 I might get the rest buh if I can't I'mma end up being more tm n can pay u that extra 4 |
| 12/2/2021 | Wilkins | Juvenile #2 | You able to get to me |
| 12/2/2021 | Juvenile #2 | Wilkins | I'm at the mall I'm riding the bus home |
| 12/2/2021 | Wilkins | Juvenile #2 | Stay at mall |
| 12/2/2021 | Juvenile #2 | Wilkins | U think u can come here |
| 12/2/2021 | Juvenile #2 | Wilkins | Oki Bhet |
| 12/2/2021 | Wilkins | Juvenile #2 | Be there in 5 |
| 12/2/2021 | Juvenile #2 | Wilkins | Bhet |
| 12/2/2021 | Juvenile #2 | Wilkins | I got 16 I'mma get more tm to |
| 12/2/2021 | Wilkins | Juvenile #2 | Wya |
| 12/2/2021 | Juvenile #2 | Wilkins | In front |
| 12/2/2021 | Wilkins | Juvenile #2 | Of what ? |
| 12/2/2021 | Juvenile #2 | Wilkins | Food court |
| 12/2/2021 | Wilkins | Juvenile #2 | Ok go to back |
| 12/2/2021 | Juvenile #2 | Wilkins | By where |
| 12/2/2021 | Wilkins | Juvenile #2 | Same place |
| 12/2/2021 | Wilkins | Juvenile #2 | I'm here |

Based on the interviews with Juveniles #2 and #3, as well as the Facebook messages between the defendant and Juvenile #2 in the table above, it appears Juvenile #2 informed the defendant she had $16 and was working to get $4 more to purchase a fentanyl pill. The defendant asked if Juvenile #2 could get to the defendant for the deal, but the two ultimately arranged to do the deal at the Citadel Mall, which is very close to the defendant's residence. Juvenile #3's bus pass from December 2, 2021, provides a time consistent with the timing of these Facebook messages.

### Search of the Defendant's Residence on March 15, 2022

On March 15, 2022, the Federal Bureau of Investigation (FBI) and CSPD executed a federal search warrant on the defendant's residence at 3310 West Portal

Page 14 of 18

Drive, Apt 1004, Colorado Springs, Colorado. Officers located and seized over 100 blue pills marked with "M" and "30," which contained fentanyl. Some of the pills were recovered from the defendant's master bedroom and some were recovered from inside her silver Jeep Grand Cherokee. Investigators believe some of the pills were packaged for distribution. Investigators also recovered $7,679 of U.S. currency in the defendant's apartment.

*Arrest and Interview of Wilkins on March 15, 2022*

The defendant was arrested at her residence when the FBI and CSPD executed the search warrant on March 15, 2022. She was transported to the CSPD Police Operations Center (POC), where she was interviewed. The interview was audio and video recorded. The defendant was read her *Miranda* rights and agreed to speak with investigators without an attorney present.

During the interview, the defendant stated she is unemployed but admitted she had been selling fentanyl pills for approximately six months. The defendant stated the pills she sells are referred to as "blues." She claimed she was unsure if all her pills contained just fentanyl, a mix of Percocet and fentanyl, or just Percocet. She said she had just purchased "blues" from her supplier on March 14, 2022, for approximately $2,000, and had distributed "blues" as recent as March 14, 2022. The defendant stated she meets some of her pill customers at the Citadel Mall, behind the food court, which is where she met Juveniles #2 and #3 on December 2, 2021.

*Summary of Culpability for Count 2*

The defendant knowingly and intentionally distributed pills to Juveniles #2 and #3, which the defendant believed contained a controlled substance. The pills the defendant distributed contained a detectable amount of fentanyl, a Schedule II controlled substance. Juvenile #1's death resulted from use of the mixture or substance containing a detectable amount of fentanyl which the defendant distributed.

## VI.    ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand that the government has an independent obligation to assist the Court in making an accurate determination of the correct guideline range. To that end, the government may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

a)    Under USSG §2D1.1(a)(2), the base offense level is **38** because the defendant is convicted under 21 U.S.C. § 841(a)(1) and

(b)(1)(C) and the offense of conviction establishes that death resulted from the use of the substance.

b)      There are no victim-related, role-in-offense, obstruction, grouping, and/or multiple-count adjustments.

c)      The adjusted offense level is **38**.

d)      Provided the defendant does not engage in prohibited conduct or otherwise implicate USSG §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a **2-level reduction** for acceptance of responsibility pursuant to USSG §3E1.1(a) and agrees to file a motion requesting that the defendant receive a **1-level reduction** for acceptance of responsibility pursuant to USSG § 3E1.1(b). With these adjustments, the resulting total offense level is **35**.

e)      The parties understand the defendant's criminal history computation is tentative and based on the defendant's prior convictions. The parties believe the defendant is in criminal history category **II**.

f)      The career offender/criminal livelihood/armed career criminal adjustments do not apply.

g)      The advisory guideline range resulting from these calculations is **240 months** (the statutory mandatory minimum sentence required by 21 U.S.C. § 841(b)(1)(C)). However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level estimated above could conceivably result in a range from 240 months (the statutory mandatory minimum sentence required by 21 U.S.C. § 841(b)(1)(C)) to 365 months (top of Category VI).

h)      Pursuant to guideline §5E1.2 and 21 U.S.C. § 841(b)(1)(C), assuming the estimated offense level above is correct, the fine range for this offense would be **$40,000 to $1,000,000**, plus applicable interest and penalties.

i)      Pursuant to guideline §5D1.2 and 21 U.S.C. § 841(b)(1)(C), if the Court imposes a term of supervised release, that term **at least three years, but not more than life**.

The parties understand that the Court is free, upon consideration and proper

application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.    ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions or assurances.

Date: 11/30/22

Alexis Nicole Wilkins
Defendant

Date: 11/30/22

Mary Butterton
Attorney for Defendant

Date: 11/30/22

Peter McNeilly
Assistant U.S. Attorney